*In re* MARRIAGE OF PENELOPE W. MALTERS, Petitioner-Appellee, and EDWARD H. MALTERS, Respondent-Appellant.

First District (2nd Division)  No. 84—0214

Opinion filed May 7, 1985.

Litwin, Zurla & Stein, of Chicago (Stuart N. Litwin and Glen Kaufman, of counsel), for appellant.

Anthony F. Mannina, of Downers Grove, for appellee.

JUSTICE PERLIN delivered the opinion of the court:

Respondent, Edward H. Malters (Edward), appeals from the distribution of property and child support orders entered by the trial court in dissolution of marriage proceedings. Edward and Penelope Malters (Penelope) were married on March 28, 1967, in Las Vegas, Nevada. Following their marriage, they resided at 25 Brinker Road in Barrington.[1] It was Penelope's first marriage. Edward had been married previously and had three sons from his first marriage who resided elsewhere. Penelope and Edward's marriage produced four children, three of whom were living at the time of the dissolution.

On April 28, 1983, a judgment of dissolution was entered and custody of the couple's two sons, aged 14 and 10, was awarded to Edward. Custody of the couple's daughter, Penelope Ann, aged 6, was awarded to Penelope. On October 20, 1983, the trial court entered an order distributing the marital assets and awarding Penelope child support. It is from this order that Edward now appeals.

On appeal, Edward contends that the trial court erred: (1) in finding the Brinker Road residence to be marital property, since it was acquired by Edward "prior to the marriage"; (2) in finding that property located in Montana was marital property when that property was allegedly obtained "in exchange" for Edward's nonmarital property; (3) in improperly valuing the parties' assets and in subsequently awarding Penelope an inequitably large share of marital property; and

---

[1]Penelope alleges that the parties lived together in the Brinker Road home for a year prior to their marriage.

(4) in ordering child support payments without a separate hearing on that issue.

At the hearing on the valuation and distribution of marital property, Edward testified to the following:

He was a physician and surgeon, licensed to practice medicine in Illinois.

In 1965, prior to his marriage to Penelope, Edward, in his own name, purchased a three-flat apartment building in Berkeley, Illinois. He lived in one apartment and rented the others. In 1967, he purchased the Brinker Road property "as an investment." Title thereto was placed in trust, with Edward as the sole beneficiary. To make the down payment, Edward borrowed $5,000 from "a friend"[2] and used $5,000 of "his own funds."[3] After renting the house for a time and applying the rental income to the mortgage payments, he moved into the house alone. Penelope did not contribute to the initial down payment nor to any mortgage payments on the house. After their marriage in 1967, Penelope moved into the house with him. The parties continued to live there with their children until Penelope left in 1979.

After Penelope left in 1979, Edward made extensive additions and repairs to the Brinker Road property. He added a kitchen, a living room, an alarm system and a swimming pool. Although Edward did much of the construction himself, he borrowed $35,000 from the First National Bank of Barrington and $45,000 from various "friends" to finance the work. When Penelope left in 1979, the house was appraised for $242,000. At the time of the dissolution proceedings, Edward believed the value to be $325,000. A mortgage of $47,000 remained on the property.

Over the past 15 years, Edward purchased certain airplane hangars. He was currently making monthly payments of $600 on two hangars in Huntley, Illinois. The original cost of one hangar was $50,000; the other, $18,000 or $19,000. He still owed "a lot of money on the hangars," and although he was "still in title," he had sold his "vested interest" in the hangars. At one time he had formed a corporation, Malters Aviation, "to lease planes and create a tax deduction"; but the corporation had been dissolved prior to the marriage dissolution proceedings. Edward owned two airplanes: a $100,000 Cessna for which he still owed $86,000, with monthly payments of $1,500; and a Piper Cub purchased for between $12,000 to $15,000, with $7,000 or $8,000 still owing. One plane was leased to a son from his first mar-

---

[2]Later identified as Penelope's father.

[3]Penelope claimed this $5,000 came from their joint funds.

riage, who paid him an unspecified amount on a yearly basis.

In 1969, Edward purchased property in Montana consisting of several thousand acres of land, cattle and a house. He set up a corporation, Malters, Inc., for this purpose of which Penelope was an officer and a shareholder. Although "most" of the Montana property was sold in 1979 for $900,000, Edward did not personally receive any of the proceeds because of "debts on the property which had to be satisfied." He still owned 300 acres of the Montana property which were also pledged as security for debts. His annual expenses for the Montana property were $4,600. In order to obtain the necessary down payment for the purchase of the Montana property, Edward had "refinanced" the three-flat in Berkeley and also the Brinker Road property. "Quite a while ago," Edward transferred title to the Montana property to his "office pension fund."

In 1981, Edward's medical corporation, Edward Malters, M.D.S.C., purchased a condominium in Elgin which he used as a medical office. The cost of the condominium was $144,000, and he had borrowed $20,000 for a down payment. His monthly mortgage payments were $2,500 and his monthly condominium assessment was $200. His medical corporation also owned two automobiles: a 1980 Honda and an AMC Eagle on which the corporation still owed $10,000.

Edward was a sole practitioner. At the time of the property hearing, his medical practice had declined by 50%. He had reduced his office staff from three secretaries to one. He was unable to afford the $2,500 per month premium necessary to cover his medical-malpractice insurance. Including the condominium and the automobiles, the debts of the medical practice approximated $175,000. Although his gross income in 1979 had been $320,000, in 1982 it was $119,305. Edward was currently serving two to three months per year on active duty in the United States Navy. The preceding year he had received $3,800 income from this activity. While on active duty, he received no income from his medical practice.

Edward's medical practice had two pension plans from which, since 1977, he had borrowed $900,000 to "meet living expenses," to "buy cattle" and to "buy airplanes."

Edward was currently paying medical school tuition for two sons from his first marriage. He also sent them spending money. His expenses for the two boys were approximately $2,000 monthly. His total monthly expenses were $16,016.59 and his monthly income was $4,006.92. He was unable to meet his mortgage payments, and his real estate tax bill was two months overdue. He had not yet begun to

pay off the loan for the swimming pool.

Norman Richter, Edward's accountant, testified: Based on its corporate assets and liabilities, he valued Edward's medical corporation at $40,000, after considering the existing assets of the corporation, its accounts receivable, and its bills outstanding. He placed no value on the "good will" of the corporation since Edward was a sole practitioner. Edward's practice had two pension plans: a "defined benefit" plan and a "money purchase" plan. Although Richter had been familiar with Edward's finances only since 1977, he believed the money had been borrowed over a number of "different periods," since the "defined benefit" plan was adopted in 1972. At the time of the hearing, no further loans could be taken from either plan. Due to a change in IRS regulations, Edward was obligated to repay by 1988 all but $50,000 of the amount borrowed from his pension funds. If he failed to do so, or if he withdrew additional funds from the plans, Edward's tax liability would be as much as $450,000.

Penelope testified to the following: She currently resided with the couple's daughter, Penelope Ann, age 7, at 676 Hillside Lane in Elmhurst. Her monthly apartment rental was $575. Although Penelope had a B.A. in nursing and had been employed as a nurse before her marriage, she was presently unemployed. She was enrolled in a "counseling masters program" at George Williams College and expected to graduate in 1½ years.

Penelope met Edward in 1958 when she was a nursing student and he was an intern at Cook County Hospital. She was living with Edward in the Berkeley three-flat purchased by him in 1965 when he purchased the Brinker Road residence in 1967. She and Edward were "pooling" their money for living expenses at that time and they had a joint account at the Elmhurst National Bank. They "had been talking" about buying a home in the Barrington or Elgin areas for "about a year." Penelope and Edward both accompanied the real estate agent when they inspected the Brinker Road property for the first time. They both signed the offer to purchase. They borrowed $5,000 from Penelope's parents and used $5,000 of their "joint funds" to purchase the house. Edward borrowed an additional $45,000 from "somewhere else" for the remainder of the down payment, and they both assumed the existing mortgage on the Brinker Road property. They bought the house "in order that we could live there and raise a family. We could live there until we grow old." Originally they rented the house and applied the rentals to their mortgage payments. The remainder of the mortgage payment came from their joint account. Contrary to Edward's testimony that she did not move into the house un-

til 1967, she and Edward both moved into the house in the fall of 1966, a year prior to their marriage, and continued to live there until Penelope left in 1979.

Penelope "cared for" the Brinker Road premises since its purchase. She planted gardens during the period it was rented. After moving into the house, Penelope did all interior maintenance work, including wallpapering, painting, refinishing windows, and moving a partition in the kitchen. Penelope also cared for the barn and the horses in the stable. She "kept the pasture," planted "over 500 evergreen trees" and "put in a beach in the area around the pond." The contents of the house were valued at $120,000 for insurance purposes while she lived there.

In 1966, according to Penelope, Edward was an anesthesiologist at Sherman Hospital; conducted a private practice in Elgin; worked for the coroner's office in Cook County; and worked for the Cook County jail. In 1971, he added a family practice in Elgin and began to work at night in the emergency room at Sherman Hospital. While he was in private practice, Penelope "kept the books" for Edward until the birth of their second child in 1973. Thereafter she "supervised" the bookkeeping. At the time of their separation in 1979, their monthly expenses were between $18,000 and $30,000.

In 1969, Penelope and Edward formed a corporation to purchase land in Montana. Edward was president of the corporation and Penelope, secretary. They were both shareholders, and Penelope "kept the books." There were two ranches on the property with cattle and equipment. Edward subsequently sold the property in "small lots" and the buyers made monthly payments directly to Edward. The payments totaled $18,000 annually at the time of the marriage dissolution, when the property was worth $1,000 per acre.

Penelope also "kept the books" for Malters Aviation while it was in existence. In 1977, when Penelope was "handling all the books," Edward transferred large sums of money to his pension funds. He later transferred the money to other accounts, such as Malters Aviation, "to pay the bills." Penelope testified, "If a bill needed to be paid out of the personal account, he would put [money] in the pension trust fund, take it out, and put it in the account that needed it."

Penelope valued Edward's gun collection to be worth over $40,000. Penelope testified that at the time of the marriage dissolution, Edward owned seven automobiles, including four Mercedes Benz.

Michael McDermott, called by Penelope, testified that he was a pension actuary and had worked with Edward's pension plans through

July 1982. The pension plans had a value of $935,647 at the end of the 1982 fiscal year. McDermott was aware that Edward had taken loans from the plans; such loans would be valued "as an asset of the plan[s]."

Thomas Guttormson, called by Penelope, testified that he had known Edward and Penelope since 1959. He had discussed the acquisition of the Brinker Road property with Edward prior to its purchase, and Edward had told Guttormson that he was borrowing $5,000 from Penelope's father for part of the down payment.

Martin Rosene, called by Penelope, testified that he was a real estate appraiser and that he had inspected the property on Brinker Road at Penelope's request. He appraised the property at $400,000.

Harry W. Carlson was called by Edward and testified that he had inspected the Brinker Road property, which he found to be in need of substantial repairs and therefore worth only $275,000. In good condition, he believed the value to be $340,000 to $350,000.

The trial court made the following findings with regard to the parties' assets and their respective values:

| | |
|---|---|
| Airplane | $ 19,000 |
| Hangar | 6,000 |
| Montana property | 240,000-300,000 |
| Pension plans | 877,346 |
| Brinker Road property | 425,000 |
| Furnishings and equipment, Brinker Road | 65,000 |
| Gun collection | 7,000 |
| Medical practice | 40,000 |
| Automobiles | No specified value |
| Total Assets | $1,900,000 |

Except for Edward's medical practice which the trial court found to be his nonmarital property, the trial court found all of the assets to be marital assets and distributed the property as follows:

| | WIFE: | HUSBAND: |
|---|---|---|
| Airplane | $ 8,000 | $ 11,000 |
| Hangar | 3,000 | 3,000 |
| Montana property | 240,000-300,000 | -0- |
| Gun collection | 3,500 | 3,500 |
| Brinker Road property | 210,000 | 215,000 |
| Furnishings, etc. | 32,500 | 32,500 |
| Pension plans | 400,000 | 477,346 |
| | $897,000-957,000 | $742,346 |

Each party was permitted to keep the automobiles then in his possession.

The trial court further found Edward liable for Penelope's "back" State and Federal income taxes in the amount of $5,000. Both parties were barred from maintenance. Edward was ordered to transfer to Penelope within 40 days of the effective date of the judgment all interest in the Montana property presently owned by them. The trial court ordered Penelope's remaining share of the marital assets to be paid as follows:

> "1. The total sum shall be paid in one hundred ninety two (192) equal monthly payments;
>
> 2. the first payment shall be due and owing upon the signing of this judgment;
>
> 3. each payment thereafter shall be due and owing on the monthly anniversary of the first payment in continuous succession;
>
> 4. the unpaid balance shall accrue with interest at the rate of nine (9%) per cent per annum on any outstanding balance previously unpaid and due;[4]
>
> 5. each interest payment shall be due and owing the following month."

Edward was ordered to pay to Penelope $1,500 monthly as child support for the parties' seven-year-old daughter.

## I

■ The first issue before this court is whether the trial court erred in classifying the marital residence on Brinker Road in Barrington as marital property.

Section 503 of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) provides in pertinent part:

> "Disposition of Property. (a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':
>
>             * * *
>
> (6) property acquired before the marriage." Ill. Rev. Stat. 1983, ch. 40, par. 503(a)(6).

---

[4]At oral argument before this court, counsel for Edward suggested that the annual interest payment due from Edward would amount to "over $50,000." This is inaccurate. Only such monthly payments as became delinquent would generate interest under this provision.

Edward contends that because the residence was acquired by him "prior to the parties' marriage" it is his nonmarital property.

In *In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 393 N.E.2d 1065, however, relied upon by the trial court here, the court found a home purchased "in contemplation of marriage" to be marital property despite the fact that it was acquired two months prior to the marriage. In *Stallings*, the home was purchased with a down payment of $5,000 of the wife's nonmarital funds, the parties took title as tenants in common and the mortgage payments were thereafter made with marital funds. The trial court found the house to be a marital asset. On appeal, this court agreed, stating:

"Regarding the real estate, we affirm the trial court's ruling that this asset was marital property. The evidence was that this property was purchased in contemplation of the forthcoming marriage of the purchasers and with the intent that it would be their family home. Furthermore, all equity in the property, other than the $5,000 down payment, resulted from the payments and improvements made during the marriage. Our new [IMDMA] does not arbitrarily categorize all property acquired prior to marriage as nonmarital property. Rather, section 503, we believe, is intended to protect such property as may have been *purchased by one spouse prior to marriage entirely with his or her own funds.* [Citation.] In *In re Marriage of Altman* (1974), 35 Colo. App. 183, 530 P.2d 1012, the Colorado Appellate Court held that where a family residence was purchased prior to, but in contemplation of, the parties' marriage and the equity resulted from the contributions of both parties, the property was marital property *even though title was acquired prior to the marriage.* When Illinois enacts a statute which has been adopted in other States and which has received constructions by the courts of those States, Illinois courts may look to those constructions. [Citation.]" (Emphasis added.) 75 Ill. App. 3d 96, 99.

In the case at bar, as in *Stallings*, the trial court found that: the Brinker Road house was purchased by the parties prior to, but "in contemplation of" their marriage; Penelope and Edward were living together at the time of the purchase and had discussed acquiring a marital home; they both accompanied the real estate agent to view the property for the first time; they both signed the offer to purchase the property; Penelope's parents provided a loan of $5,000 towards the down payment; an additional $5,000 came from the parties' joint funds; they used joint funds in addition to the rental income from the

property to make the mortgage payments prior to moving into the home; during the marriage all mortgage payments were made from marital funds. Although Edward's testimony disputed some of these findings, the trial court is in the best position to evaluate the credibility of the witnesses. *In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 393 N.E.2d 1065.

Edward contends that the legislature's recent amendment of subsection (c) of section 503 of the IMDMA precludes a finding that the Brinker Road residence was marital property. It has been recognized, however, that this amendment was a "legislative rejection of the *rationale* of *In re Marriage of Smith* (1981), 86 Ill. 2d 518, 427 N.E.2d 1239, and its progeny." *In re Marriage of Brown* (1984), 127 Ill. App. 3d 831, 469 N.E.2d 612; Feldman & Fleck, *Taming Transmutation: A Guide To Illinois' New Rules on Property Classification & Division Upon Dissolution of Marriage*, 72 Ill. B.J. 336 (1984).

In *Smith*, a nonmarital building owned by the husband and valued at $45,000 was improved with $3,800 of marital funds. Our supreme court held that this contribution of marital funds presumptively *transmuted* the entire building to marital property, stating:

"[W]here a spouse who holds nonmarital property causes it to be commingled with marital property, \*\*\*, of the other, \*\*\* the commingled property is presumed to be marital property." *In re Marriage of Smith* (1981), 86 Ill. 2d 518, 529.

The *Smith* decision and others following in its wake (see, *e.g.*, *In re Marriage of Lee* (1981), 87 Ill. 2d 64, 430 N.E.2d 1030) were said to "enunciate an extreme theory of transmutation which provided insufficient protection for nonmarital property upon the dissolution of marriage. \*\*\* Under the *Smith* rationale, the use of a spouse's salary to make a mortgage payment could transmute an entire asset into marital property regardless of the discrepancy between the slight value of the contribution and the far greater value of the asset. Such a rule renders the concept of nonmarital property illusory." Feldman & Fleck, *Taming Transmutation: A Guide to Illinois' New Rules on Property Classification & Division Upon Dissolution of Marriage*, 72 Ill. B.J. 336, 336-37 (1984).

*Stallings* does not present a significant threat to the concept of nonmarital property as did the transmutation rationale of *Smith*. In *Stallings*, the court was concerned with a marital residence clearly purchased in contemplation of marriage with the intent that it be the family home, where most of the equity in the home resulted from payments and improvements made during the marriage. (*Cf. In re Marriage of Reeser* (1981), 97 Ill. App. 3d 838, 424 N.E.2d 45.) Although

we have been unable to find Illinois precedent, we do not believe that the legislature, by its amendment of subsection (c) of section 503 of the IMDMA (Ill. Rev. Stat. 1983, ch. 40, par. 503(c)) sought to preclude a finding that a home acquired prior to marriage was nevertheless a marital asset. In our opinion the trial court did not err in classifying the Brinker Road residence as a marital asset.

## II

■ The next issue is whether the trial court correctly found the Montana property to be a marital asset. Edward maintains that this property was his nonmarital asset because it was allegedly obtained "in exchange" for his nonmarital property (*i.e.*, funds derived from refinancing the three-flat and the Brinker Road residence).

Section 503(a)(2) of the IMDMA provides:

> "Disposition of Property. (a) For purposes of this Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':
>
> * * *
>
> (2) property acquired in exchange for property acquired before the marriage ***." Ill. Rev. Stat. 1983, ch. 40, par. 503(a)(2).

Based on this provision of the statute, Edward contends that the Montana real estate was nonmarital because the down payment on that property was obtained by "refinancing" the three-flat in Berkeley and also the Barrington property, both of which he maintains were nonmarital property. However, as heretofore discussed, the trial court properly found the Barrington residence to be marital property. Therefore, we conclude that the Montana property was acquired with a down payment of partially nonmarital funds.

This court rejected a similar argument to that presented here by Edward in *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 399 N.E.2d 1006. In *Leon*, the parties' first home had been purchased after marriage with a down payment from the husband's nonmarital funds. Mortgage payments were made from the husband's salary which had been placed in the parties' joint account. After the first home was sold, the parties bought a second home, using as a down payment $30,000 derived from the equity in the first home plus an additional $10,000 of the husband's nonmarital funds. Mortgage payments were again made from the husband's salary placed in the parties' joint account. On appeal, the husband contended that since the second home had been acquired with a down payment allegedly stemming from his nonmarital property, the new home was likewise his

nonmarital property. This court did not agree, noting that despite the source of the funds used as a down payment in the purchase of the second home, all property acquired after marriage is presumed to be marital property. (*Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 429 N.E.2d 465.) The *Leon* court held that since the mortgage payments on both homes were, in this instance, made from marital funds, the fact that the down payments had been derived from nonmarital funds was not sufficient to rebut the presumption that the property was marital.

With regard to the Montana property, we note first that there was no indication in the trial court, nor does Edward contend on appeal, that mortgage payments or other expenses were made with nonmarital funds. Since the property was acquired in 1969, after the parties married, there is a presumption that it is marital. The fact the down payment was derived partially from refinancing nonmarital property is not sufficient to rebut this presumption. (*In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 399 N.E.2d 1006.) We find the trial court did not err in classifying the Montana property as a marital asset.

## III

■ The next issue is whether the trial court erred in its valuation and distribution of the assets of the parties. A trial court has broad discretion in the valuation and subsequent distribution of marital assets. (*In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 441 N.E.2d 336.) In determining whether a trial court has abused this discretion the question is, "Did the trial court *** act arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceed the bounds of reason and ignore recognized principles of law so that substantial injustice resulted?" (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 319, 435 N.E.2d 866.) In short, in order to correctly evaluate marital assets, the trial court must have before it competent evidence of value, and its determination of value must be supported by that evidence. (*In re Marriage of Carini* (1983), 112 Ill. App. 3d 375, 445 N.E.2d 412.) In the present case, we find that the trial court abused its discretion in evaluating and apportioning certain marital assets. Such action requires reversal and remandment for a new trial with regard to these issues.

■ First, as Edwards contends, in valuing the pension plans the court does not appear to have taken into consideration Edward's unrebutted testimony that the title to the Montana property had been placed in his pension plans. Thus, in assigning a value of $240,000 to

$300,000 to the Montana property and a value of $877,346 to the pension plans, Edward argues that the trial court apparently duplicated the value of the Montana property, thereby overstating the parties' assets by as much as $300,000. Clearly, this would be error (*In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 443 N.E.2d 31), and a redetermination of value with regard to the pension plans and the Montana property is necessary.

■ Second, the trial court valued the Brinker Road property at $425,000. Such determination does not appear supported by any evidence presented by either party in the trial court. Penelope's expert witness testified that the value of the property was $400,000; Edward's that the value of the property was, at most, $350,000. Nevertheless, the trial court without explanation, valued the property at $425,000. Since there appears to be no evidence to support the trial court's conclusion, such determination of value was error. *In re Marriage of Carini* (1983), 112 Ill. App. 3d 375, 445 N.E.2d 412.

●6 Third, we note that the trial court failed to assign a value to the three-flat located in Berkeley, Illinois, nor was evidence presented on this issue. An award dividing the property of the parties is "inappropriate without an evidentiary determination of the value of the husband's nonmarital assets." (Ill. Rev. Stat. 1983, ch. 40, par. 503(c)(2); *In re Marriage of Hapaniewski* (1982), 107 Ill. App. 3d 848, 438 N.E.2d 466.) Upon remand, therefore, the trial court should receive evidence and make a determination of the value of the Berkeley three-flat.

■ Fourth, we must agree that Edward's contention that the subsequent distribution of marital property by the trial court was not in "just proportions" may have merit in view of the "evidence adduced at trial regarding Dr. Malters' substantial indebtedness." Although the trial court noted "marital debts" of $900,000 to Edward's pension plans, the trial court assigned all responsibility for such debts to Edward, finding that he had dissipated marital assets.

Under section 503 of the IMDMA, the trial court is required, without regard to misconduct, to divide the property of the parties "in just proportions" considering all relevant factors, including:

"(1) The contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit;" Ill. Rev. Stat. 1983, ch. 40, par. 503(d)(1).

Dissipation of marital assets occurs when a spouse "uses marital property for his or her own benefit for a purpose unrelated to the

marriage while the marriage is breaking down." (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313.) Although it has been held that where one spouse has dissipated marital assets it is not error to charge the amount dissipated to that party in the distribution of marital property (*In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 488 N.E.2d 545), here our review of the record establishes that the pension funds were depleted not only after Penelope left the marital residence in 1979, but at least as early as 1977, in order to support not just Edward but Penelope and the children as well. Moreover, it appears that this course of conduct was not just for Edward's own purposes, but rather to support the style of living that both parties enjoyed. We believe, therefore, that the trial court erred in its distribution of marital assets in failing to consider Penelope's partial responsibility for the depletion of the pension funds. See *In re Marriage of Reeser* (1981), 97 Ill. App. 3d 838.

■ Fifth, Edward asserts that the trial court erred in awarding the Montana property to Penelope and ordering him to transfer all rights and title thereto to Penelope within 40 days, apparently without considering the substantial tax consequences of such a transfer to Edward. As noted, according to Edward's unrebutted testimony the title to the Montana property had been placed in the pension funds; Edward, his accountant and Penelope's expert witness, Michael McDermott, all testified that any further transfer of funds from the pension plans could cause them to terminate, resulting in as much as a $450,000 "taxable event" to Edward.

Under the pertinent provisions of the IMDMA, the trial court is specifically directed to consider, in its distribution of marital assets, "the tax consequences of the property division upon the respective economic circumstances of the parties." (Ill. Rev. Stat. 1983, ch. 40, par. 503(d)(11).) Thus the trial court's apparent failure to consider the tax consequences of the transfer of the Montana property was contrary to the statute and, therefore, error.

## IV

■ Edward's final contention is that the trial court erred in ordering him to pay $1,500 monthly for the support of the parties' seven-year-old daughter, Penelope Ann, without conducting a separate hearing on that issue. Rather, the trial court determined the amount of support on the basis of affidavits in the record with regard to Penelope Ann and Penelope's needs and resources during the parties' dissolution proceedings, as well as the testimony at the property hearing.

Because the division of marital property is among the factors to be considered in determining an appropriate amount of child support (Ill. Rev. Stat. 1983, ch. 40, par. 505(a)(2)), courts have "deemed it desirable to remand to the trial court all interrelated property and support issues once it has been determined that the property division was improper." (*In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 443 N.E.2d 31.) Accordingly, since this cause must be remanded for a new trial in order to properly value and distribute marital assets, the amount of child support appropriate for Penelope Ann must be redetermined after an equitable distribution of property is effected. *In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 443 N.E.2d 31.

With regard to the necessity of a hearing, although certain cases have held that for purposes of support expenses may be determined by affidavit rather than testimony (*In re Marriage of Johnson* (1982), 106 Ill. App. 3d 502, 436 N.E.2d 228), in the instant case we believe that, even assuming that the trial court did not err in originally relying upon the affidavits in combination with the parties' testimony at the property hearing, due to the passage of time these affidavits may no longer accurately portray Penelope Ann's needs. Therefore, upon remand of this matter the trial court is directed to hold a hearing on the issue of child support for Penelope Ann, taking into consideration all of the factors indicated by the IMDMA as relevant to such a determination. Ill. Rev. Stat. 1983, ch. 40, par. 505(a).

For the reasons stated herein, the judgment of the trial court is affirmed with regard to its classification of the Brinker Road residence and the Montana property as marital assets; judgment is reversed with regard to the valuation and subsequent distribution of assets, as well as the issue of child support. This cause is remanded for proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

HARTMAN and BILANDIC, JJ., concur.