JAMES A. SZESNY, Respondent-Appellant, v. TARYN SZESNY, Petitioner-Appellee.

First District (6th Division)  No. 1—89—1747

Opinion filed April 27, 1990.

Zaborsky & Aleksy, of Chicago (Richard E. Aleksy and Davia M. Grigaitis, of counsel), for appellant.

Richter & Dennis, of Chicago (Harold Richter, of counsel), for appellee.

PRESIDING JUSTICE LaPORTA delivered the opinion of the court:

Respondent appeals from a judgment of dissolution of marriage, claiming that the trial court abused its discretion in imposing almost

the entire marital debt of over $82,000 upon him, and in modifying the visitation order to a more restrictive schedule. We affirm as to the distribution of marital debt and reverse and remand as to the visitation schedule.

The parties were married on November 1, 1980, in Chicago Heights, Illinois. From the time of their marriage until late in 1984, they lived with respondent's mother, paying no rent and making no monetary contributions to the household. In 1984 the couple purchased a house, borrowing the money needed for earnest money deposit ($5,000) and for a down payment ($20,000) from the bank where respondent worked. The loans were secured by one-year lump-sum notes and liens on the cars of respondent's mother and sister. The remaining $70,000 of the purchase price came in the form of a purchase money mortgage against the house, also held by the bank where respondent worked.

Petitioner testified that after they purchased the house, their standard of living went down; they did not go out as often and went to "cheap places." Petitioner testified that she told respondent that their credit cards should be destroyed and she destroyed several of them herself. Respondent testified that he opened new charge accounts and took the cash advances to pay off other charge accounts. Petitioner testified that she did not sign for these credit cards although some of them bore her name.

Respondent testified that their standard of living did not abate, and in fact their living expenses increased dramatically. Their consumer debt jumped from nothing to $40,000 in 1984, with $20,000 owed on charge cards at the end of 1985, $43,000 owed at the end of 1986, and over $70,000 owed at the end of 1987. The current debt is approximately $82,000. Respondent testified that various loans were taken out in an effort to retire some of the debt. He also admitted to "playing the float" with their joint checking account, by hoping that deposits would arrive in time to cancel overdrafts.

Petitioner testified that she would attempt to "forced balance" their checking account registers at the end of each month, but that this was difficult because respondent would not record all transactions, would use counter checks instead of those provided for their account, and would not report deposits. When petitioner questioned respondent about the entries, they would argue and he would beat her. Respondent admitted that he did not always tell petitioner about a deposit but testified that he always made a notation in the check register, and that petitioner would ask him about them when reconciling the checkbook.

Respondent discussed their financial situation with petitioner, including the loans, but petitioner testified that what memory she has of these discussions is not enlightening. Respondent also claimed that the bank for which he works would reimburse him in cash for performing repossessions and for business expenses such as client lunches. Petitioner testified that she never paid attention to their tax returns, but signed them at respondent's direction.

One child, a son, was born of the marriage, on November 1, 1985, and no children were adopted. Petitioner was granted temporary custody of the son by an agreed order in January 1988, and the trial court granted permanent custody to her in the judgment of dissolution. Respondent was granted visitation on alternate weekends, from 7 p.m. Friday until 6 p.m. Sunday. During 1988 respondent filed several emergency petitions to enforce this provision of the agreed order. Petitioner defended against the first that she had refused visitation because their son had been ill and because the son was calling respondent's live-in girlfriend "Mother." An agreed order was entered that visitation would be maintained and the son would be instructed not to call anybody except petitioner "Mother." In response to the second and a third petition for violation of visitation, petitioner was ordered to adhere to the established visitation schedule. Respondent was ordered to pay petitioner accrued child support.

Respondent filed a fourth petition for rule to show cause against petitioner in September 1988, to enforce the visitation agreement. Petitioner responded and moved for modification of the visitation schedule due to respondent's failure to pick up the son as scheduled, respondent's physical abuse of petitioner, respondent's having struck petitioner's father with his car, respondent's leaving the son on the doorstep without ringing the bell, and the son's "upset, morose and withdrawn" state when returned to petitioner following time spent with respondent. Respondent responded to petitioner's petition for modification with countercharges of her lack of cooperation.

The first nonparty witness called at trial on December 6, 1988, was the bank employee who had verified petitioner's signature on a letter requesting her IRA at another bank to be closed. The bank employee testified that she was a co-worker of respondent's and that she could not recall the details of that particular letter, although on occasion she might guarantee the signature of a bank officer's relative at his request without verifying the signature. Respondent stated when giving testimony that he prepared the letter and that petitioner had signed it at his request. Petitioner testified that she did not sign the letter or otherwise authorize the closure of her IRA.

Upon discovering that the IRA was closed, petitioner contacted another officer of the bank, who testified in response to subpoena that she investigated the situation and was told by respondent that he had signed petitioner's name to the letter but that petitioner had authorized it. She testified that respondent told her that the money was needed to pay marital debts and she subsequently determined that the money had been placed into the joint checking account and used to honor checks drawn by both respondent and petitioner. At this time her investigation was terminated. The trial judge noted that while the bank employee and bank officer were testifying, respondent "refused to look at them and turned his back on them."

Respondent was called by petitioner as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1102). He testified about the letter requesting that petitioner's IRA be closed and the money sent to respondent's mother's address; his relationship with a woman named Barbara "Lush" or "Losh," whom he first stated he did not know but later admitted seeing frequently at his health club; and the couple's financial situation, including the growth of their consumer debt during the period from 1984 to 1988. Petitioner then testified as to the couple's financial situation and the problems with visitation. Petitioner also testified that respondent abused her, beat her monthly, burned her face, and threw her out of a car. Respondent testified on his own behalf that he had to file petitions to force petitioner to abide by the visitation schedule and gave further details about the couple's financial situation and style of living and the loans retired and loans outstanding.

Judgment of dissolution was entered on June 2, 1989. The court assessed against respondent all of the marital debt except for the amounts outstanding on petitioner's Mazda and the vanity which respondent had given her. Petitioner was granted custody of the minor child. The trial judge enumerated specific incidents in which respondent arrived with the smell of alcohol on his breath or left their son at a darkened door without ringing the bell to let petitioner know that their son was home, and ruled "that visitation should be restricted at this time." The court established a visitation schedule of visits which was one weekend per month plus one day on each other weekend, instead of the prior agreed visitation schedule of alternate weekends. The court specifically reserved the question of extended visitation during spring, summer, and Christmas vacations pending a psychiatric evaluation. Respondent filed his appeal on July 3, 1989.

Respondent's first argument is that the trial court inequitably dis-

tributed the marital assets and debts by granting all assets to petitioner and assessing all debts against respondent. The trial judge found no appreciable marital assets, that petitioner possessed only a triply-refinanced 1984 Mazda and a vanity which had been a gift from respondent, and that respondent retained what little marital property remained. Respondent argues that this decision is arbitrary and an abuse of the trial court's discretion.

■ A reviewing court will not substitute its judgment for that of the trial court unless the trial court clearly acted arbitrarily and beyond the bounds of reason. (*In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 180, 478 N.E.2d 1068, 1076; *In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 550, 511 N.E.2d 676, 680; *Head v. Head* (1988), 168 Ill. App. 3d 697, 702, 523 N.E.2d 17, 21.) The mere fact that reasonable men could reach different conclusions on the facts of the case is insufficient to find that the trial court abused its discretion; only if no reasonable person could find as the trial court did is there an abuse of discretion. *In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126, 129; *In re Marriage of Ryan* (1985), 138 Ill. App. 3d 1077, 1080, 487 N.E.2d 61, 63.

Respondent relies heavily upon the holding in *In re Marriage of Goforth* (1984), 121 Ill. App. 3d 673, 459 N.E.2d 1374, to support his contention that assignment of all marital debt to one party is on its face an abuse of discretion. In that case, the parties had been married for 14 years and had lived considerably beyond their means. (*Goforth*, 121 Ill. App. 3d at 679, 459 N.E.2d at 1379.) The wife-respondent received the marital home and furnishings and her car, for a total of $81,000 in assets without any debt. (*Goforth*, 121 Ill. App. 3d at 677-78, 459 N.E.2d at 1378.) The husband-petitioner was given token assets while being ordered to assume all marital debt plus the wife-respondent's attorney fees, for a total of approximately $128,000. (*Goforth*, 121 Ill. App. 3d at 678, 459 N.E.2d at 1378.) The husband-petitioner was also ordered to pay 40% of his net income for maintenance and child support. (*Goforth*, 121 Ill. App. 3d at 678, 459 N.E.2d at 1378.) The appellate court found this decision a clear abuse of discretion because both parties had created the debt and neither could begin anew. *Goforth*, 121 Ill. App. 3d at 680-81, 459 N.E.2d at 1379.

However, in the case here the trial court specifically found that respondent was solely responsible for the over $82,000 in debt. There was testimony that after they purchased the marital home, petitioner drastically reduced her expenditures while respondent maintained or increased his. The trial court noted that respondent would go out at night without his wife and child; that he belonged to a health club;

that respondent opened charge accounts without petitioner's knowledge or permission; that respondent spent money on clothing for himself and at fine restaurants; that he gave money to his mother; that respondent borrowed money but did not use it to reduce the marital debt; and that he "in effect kited his account in consumer debts." The trial court also found that petitioner spent minimal amounts on clothing, ate in fast-food restaurants, and in one year was responsible for less than one-twelfth of their total expenses.

Dissipation can occur prior to dissolution. (*Partyka*, 158 Ill. App. 3d at 549, 511 N.E.2d at 680.) The key is whether one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage. (*Malters*, 133 Ill. App. 3d at 181-82, 478 N.E.2d at 1077.) When one party is charged with dissipation, he must prove by clear and convincing evidence that the questioned expenditures were made for a marital purpose. (*In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 51, 448 N.E.2d 545, 548; *In re Marriage of Westcott* (1987), 163 Ill. App. 3d 168, 176, 516 N.E.2d 566, 570.) Unsupported statements that the funds were used for marital purposes are insufficient. *In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 886, 507 N.E.2d 207, 210.

The trial court here noted that respondent claimed to have spent the money for family expenses but that he could produce only a few credit card statements for insignificant amounts. The court also noted that respondent opened credit card accounts without petitioner's permission, even though her name was used, and that respondent retained total control of these accounts, having the statements sent to his mother's house. Where one spouse has sole access to funds or incurs debt without the knowledge of the other, that spouse can be held to have dissipated marital assets and can be held responsible for the entire debt. (*Ryan*, 138 Ill. App. 3d at 1081, 487 N.E.2d at 64; *In re Marriage of Kaplan* (1986), 149 Ill. App. 3d 23, 32, 500 N.E.2d 612, 618.) Here respondent had sole access to the credit cards used to incur the debt, and for that reason, the trial court properly found that he alone would be held responsible.

Respondent's second argument is that the trial court erroneously considered his marital misconduct in making the division of marital assets and debt, claiming that admission into evidence of wife's medical bills for plastic surgery necessitated by facial burns caused by him and the cards sent to him by a woman he met and befriended at his health club was prejudicial. However, the court merely mentioned them and respondent's testimony regarding the woman, and the record does not reflect that the court based its decision on this conduct.

The trial judge clearly relied upon respondent's sole access to the charge cards used to incur the debt, his inability to show any family benefit from his expenditures, his questionable reports of deposits into and withdrawals from the joint checking account, and respondent's frequent beating of petitioner when she questioned him each month when she tried to reconcile the check register with the bank statement. The record does not support respondent's argument that the trial court's division of the marital debts and allocation of the majority of them to respondent was based on his physical mistreatment of petitioner or possible marital infidelity.

■ Respondent also claims that the trial court improperly permitted testimony regarding visitation with their son to be admitted, but because visitation was an issue at trial and is an issue on this appeal, admission of such testimony was not error.

■ Respondent's third argument is that petitioner was a noncredible witness. Generally, a reviewing court will not disturb the trial court's determination of credibility because the trial court has a unique opportunity, which cannot be reproduced from the cold, inanimate record, to observe and judge the witness' demeanor and credibility. (*Kaplan,* 149 Ill. App. 3d at 28, 500 N.E.2d at 616.) A reviewing court will not overturn a trial court's determination of credibility unless it appears contrary to the manifest weight of the evidence. *Westcott,* 163 Ill. App. 3d at 178, 516 N.E.2d at 570; *In re Marriage of Getautas* (1989), 189 Ill. App. 3d 148, 155, 544 N.E.2d 1284, 1288.

In her decision, the trial judge here noted that she had carefully observed the parties both while they testified and while others testified. She specifically noted that when two of respondent's co-employees testified under subpeona, he refused to look at them and turned his back on them when they testified. The court also commented that the respondent initially denied that he knew the woman who had sent cards to him and his son, then after some dissembling admitted that he knew the woman but denied any sexual or social involvement with her.

■ Based on all the evidence, the trial judge found petitioner's testimony credible and respondent's testimony not credible and at times incredible. There is nothing in the record which indicates that this assessment is sufficiently inaccurate to warrant reversal.

■ ■ Respondent's final argument is that the trial court abused its discretion in restricting his visitation with the couple's now four-year-old son and in ordering a psychiatric evaluation before extended visitation would be permitted. The Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1987, ch. 40, par. 101 *et seq.*) provides

that "[a] parent not granted custody of the [son] is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger seriously the [son's] physical, mental, moral or emotional health." (Ill. Rev. Stat. 1987, ch. 40, par. 607(a).) While the court may, as here, modify a preexisting visitation order, "the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the [son's] physical, mental, moral or emotional health." (Ill. Rev. Stat. 1987, ch. 40, par. 607(c).) The determining factor in modifying a visitation order is whether the son would be harmed by continuation of the current order. (*Valencia v. Valencia* (1977), 46 Ill. App. 3d 741, 745, 375 N.E.2d 98, 101; *In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 1112, 421 N.E.2d 1308, 1311.) The burden of proving endangerment is on the custodial parent (*In re Marriage of Solomon* (1980), 84 Ill. App. 3d 901, 906, 405 N.E.2d 1289, 1294; *Crichton v. Crichton* (1979), 75 Ill. App. 3d 326, 329, 393 N.E.2d 1319, 1321) and is an onerous one. *In re Marriage of Hanson* (1983), 112 Ill. App. 3d 564, 568, 445 N.E.2d 912, 915; *In re Marriage of Neat* (1981), 101 Ill. App. 3d 1046, 1048, 428 N.E.2d 1093, 1095.

■■■ Here petitioner offered her own testimony as to the son's state before and after visitation, and related specific incidents in which respondent's actions were dangerous to the son. Petitioner testified that she had taken the son to see a social worker and that one or more sessions with a psychiatrist were scheduled, but that no professional evaluation took place. No written reports of psychiatric evaluations or expert testimony were offered to support a change in the visitation schedule previously in place. For these reasons, we find that absent evaluation by such an expert the evidence in the record is insufficient to support the trial judge's change in visitation schedule.

We affirm the distribution of marital debt as ordered by the trial court.

As to the visitation schedule, we reverse and remand with directions that the original visitation schedule be restored and that the court conduct a further hearing to consider psychiatric evaluation to determine whether the welfare of the child requires a modification of the visitation schedule.

Affirmed in part; reversed and remanded in part.

McNAMARA and EGAN, JJ., concur.