*In re* MARRIAGE OF WILLIAM PHILIPS, Petitioner-Appellee, and LON-NEE PHILIPS, Respondent-Appellant.

First District (5th Division)   No. 1—87—3537

Opinion filed June 15, 1990.

Richard Gigante, of Chicago (Paul R. Jenen, of counsel), for appellant.

Kalcheim, Schatz & Berger, of Chicago, for appellee.

JUSTICE LORENZ* delivered the opinion of the court:
This appeal arises out of an action for dissolution of the marriage of Lonnee and William Philips. Lonnee Philips challenges several aspects of the judgment: whether a condominium was converted to marital property; whether the distribution and assignment of property and indebtedness were proper; whether marital assets were dissipated; and whether denial of maintenance was proper.
We affirm.

*Prior to his resignation, Justice R. Eugene Pincham was assigned to and heard oral arguments in the above case. Following Justice Pincham's resignation, the case was reassigned to Justice Lorenz, who read the parties' briefs and listened to a tape of the oral arguments.

At the time of the parties' trial, William Philips (William), a commodities trader, was 45 years old. Lonnee Philips (Lonnee) was 37 years old. William and Lonnee began dating in July 1982. At that time, William was separated from his first wife and lived in an apartment in Water Tower Place in Chicago. Lonnee was then divorced and lived with her minor son in a townhome in North Miami Beach, Florida, provided by her former husband pursuant to their dissolution of marriage decree.

In 1983, William's wife filed an action to dissolve their marriage. That action became final on March 27, 1984.

On March 29, 1984, William purchased a townhome in Florida, in Lonnee's name, near the one in which Lonnee lived under her prior divorce decree.

At about that time, the parties located a condominium at 1500 North Astor Street (Astor condominium) in Chicago for purchase. On April 9, 1984, William purchased the Astor condominium for approximately $465,000 in cash from funds in his trading account. William held title to the Astor condominium through an assignment of beneficial interest in a land trust and retained sole power of direction.

On April 21, 1984, William and Lonnee married.

On April 25, 1984, William purchased a 1984 Jaguar for $37,000 in cash in both parties' names.

On May 7, 1984, William executed an assignment of the beneficial interest in the Astor condominium to himself and Lonnee as joint tenants, but retained sole power of direction. Shortly thereafter, the parties found the property unsuitable and decided to sell it. By virtue of William's earning capacity, a $250,000 "bridge loan" from Harris Bank was obtained, and, in July 1984, William purchased a condominium at 1418 North Lake Shore Drive (Lake Shore condominium) for $519,000, paying the excess of the purchase price over the loan in cash. Title was held in William's name.

In October 1984, the Astor condominium was sold for approximately $469,000 and the bridge loan was repaid.

The record indicates William's income fluctuated during the period of the parties' relationship and marriage. At the time of the parties' marriage, William's net worth was approximately $1.3 to $1.5 million, based on the value of the trading seat, equity in his trading accounts, equity in a loan to a company in which he had invested, as well as other investments.

However, William's trading accounts began showing debit balances in 1985. As William's income declined and his expenses remained constant, he withdrew money from his trading accounts to

cover those expenses. At the time of trial, the trading accounts reflected debit balances of approximately $85,000.

In May 1985, William filed his petition for dissolution of marriage. A subsequent attempt at reconciliation failed, and he proceeded with the dissolution action.

Thereafter, Lonnee charged $20,000 on William's credit cards, returning approximately $14,000 worth of goods for cash by May 1986 in order to pay her living expenses during the pendency of the dissolution action. Lonnee also borrowed small sums from friends and rented the Florida townhome to pay her living expenses.

Lonnee presented no motion for temporary maintenance during pendency of the dissolution action.

Following trial proceedings, the trial judge determined the Astor condominium was William's nonmarital property. And, because William used the $465,000 in proceeds from sale of that property to purchase the Lake Shore condominium, the trial judge determined William was entitled to that amount from the proceeds of the sale of the Lake Shore condominium as a contribution of nonmarital funds to that marital asset.

The trial judge found the 1984 Jaguar automobile to be marital property, having a fair market value of $20,000. The trial judge ordered the automobile to be sold and the first $7,000 of the proceeds from the sale applied to the payment of Lonnee's attorney fees. Excess proceeds were to be held in escrow pending future petitions for attorney fees. Any remaining proceeds were then to be paid to William.

The trial judge required William to pay the following marital indebtedness: $329,750 in principal and interest owed to the Harris Bank; $150,000 owed personally to Henry Shatkin; $110,000 representing a debit balance in one of William's trading accounts; $11,069.43 owed on bank credit cards; $20,000 to $30,000 in estimated tax liability for 1986; $17,617.16 owed in real estate taxes for 1986 and 1987 on the Lake Shore condominium; and $4,000 in miscellaneous bills.

Lonnee was ordered to pay, as marital debts: $13,000 in attorney fees and a total of $5,700 owed to several individuals.

The trial judge found Lonnee had used the $20,000 worth of charged clothing for living expenses and, therefore, had not dissipated a marital asset in that amount.

The trial judge also determined Lonnee had presented no evidence to establish that William had dissipated marital assets.

Last, citing the brief duration of the marriage, and because Lon-

nee had made no effort to secure employment, the trial judge denied Lonnee maintenance.

Other facts pertinent to the disposition of the issues raised on appeal will be summarized within the context of our opinion below.

Opinion

Lonnee first contends the trial judge erred in concluding William overcame the presumption contained in section 503(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1983, ch. 40, par. 101 *et seq.*) that the Astor condominium was marital property. Lonnee argues the Astor condominium was purchased in contemplation of the parties' marriage, citing her own trial testimony that, in January 1984, prior to dissolution of William's prior marriage, she and William had begun to look for a residence in Chicago. Lonnee also notes that soon after she and William were married, William assigned the beneficial interest in the property to himself and Lonnee as joint tenants. Lonnee contends the transfer created a presumption of a gift of the property to the marital estate. Lonnee also cited *In re Marriage of Ohrt* (1987), 154 Ill. App. 3d 738, 507 N.E.2d 160, *In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 478 N.E.2d 1068, and *In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 393 N.E.2d 1065, in support of the contention that Illinois courts have created an exception to the general statutory definition of marital property where evidence indicates property is purchased in contemplation of marriage.

Lonnee further notes that although William purchased the Florida townhome in Lonnee's name and the Jaguar automobile and a tax shelter investment in both parties' names, he asserted at trial that the townhome was marital property and the other two assets nonmarital in nature. Apparently because the trial judge ultimately concluded, contrary to those assertions, that the townhome was Lonnee's nonmarital property, and the automobile and investment were marital properties, distribution of the Astor condominium to William was somehow inconsistent.

■ We are not persuaded by Lonnee's arguments. Section 503(b) indeed creates a presumption that property *acquired after* marriage and before a judgment of dissolution, including nonmarital property transferred into a form of co-ownership, is marital property. (Ill. Rev. Stat. 1983, ch. 40, par. 503(b).) However, that presumption is rebutted where it is shown, pertinent here, that the property was acquired before the marriage. Ill. Rev. Stat. 1983, ch. 40, par. 503(a)(6).

■■■ In the instant case, William purchased the Astor condomin-

ium before the marriage. While we are familiar with the line of authority Lonnee relies on, holding that property acquired before a marriage may nevertheless be included in the marital estate, the circumstances of the Astor condominium's purchase here do not merit application of the rule applied in such cases. We do not read the cases cited by Lonnee as creating an exception to the statutory exceptions provided in section 503(a) as Lonnee suggests. Generally, the cases stand for the rule that, where the parties use common finances to purchase a home prior to, and in contemplation of, marriage, courts will not permit one party to benefit over the other simply because the purchase precedes the marriage. Thus, a residence purchased prior to the marriage may nevertheless be marital property when "marital funds" are used to repay a loan used for the down payment as well as for mortgage payments (see *Ohrt*, 154 Ill. App. 3d at 742, 507 N.E.2d at 163), or "joint funds" are used for a down payment and those funds, as well as rental income generated from the property, are used to make mortgage payments prior to moving into the home and, during the marriage, the payments are made with "marital funds" (see *Malters*, 133 Ill. App. 3d at 177-78, 478 N.E.2d at 1074). Here, however, the Astor condominium was purchased entirely with William's own funds prior to the parties' marriage. And, we note, it has been recognized that "section 503 *** is intended to protect such property as may have been purchased by one spouse prior to marriage entirely with his or her own funds." (*Stallings*, 75 Ill. App. 3d at 99.) We therefore do not conclude that the Astor condominium was improperly considered William's nonmarital asset.

Lonnee next contends the trial judge failed to consider certain expenditures of, and indebtedness incurred by, William as dissipations of marital assets.

Under section 503(d)(1) of the Act, one of the factors which must be considered in the distribution of marital property in a dissolution action is "the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit." (Ill. Rev. Stat. 1983, ch. 40, par. 503(d)(1).) The issue in determining whether a dissipation is shown is whether the party used marital property for his own benefit for a purpose unrelated to the marriage during a period when only that party had access to the funds. (*In re Marriage of Westcott* (1987), 163 Ill. App. 3d 168, 516 N.E.2d 566.) Whether a given course of conduct constitutes dissipation within purview of the Act depends upon the facts of the particular case. (*In re Marriage of Siegel* (1984), 123

Ill. App. 3d 710, 463 N.E.2d 773.) The trial court's division of property may be disturbed only where an abuse of discretion exists and, absent such showing, it is immaterial whether we agree with the trial judge's distribution.

Lonnee argues the trial judge failed to consider four dissipations of funds by William: $581,395 from William's personal bank accounts in 1985; $15,000 from the sale in 1986 of a parking space owned in conjunction with the Lake Shore condominium; $91,137 from a 1985 income tax refund; and the act of securing two Harris Bank loans totalling $325,000 with the interest in the Lake Shore condominium.

Lonnee contends the $581,395 amount resulted from William's manipulation of his financial affairs in such a fashion as to create the impression that he incurred business losses requiring him to borrow in order to maintain his life-style and continue in his trading business. Lonnee cites her own testimony at trial concerning conversations with William in May and July 1986, in which William indicated he was liquidating his assets in order to create a debit balance in his trading account. Specifically, Lonnee claims, the $581,395 figure consisted of $331,395 transferred from William's trading account into personal bank accounts, and $250,000 representing a loan from Harris Bank.

The following facts aid in understanding the arguments advanced by Lonnee regarding the above-claimed dissipations. William traded as a member of the Chicago Board of Trade and also maintained a trading account at the Chicago Board Options Exchange. William cleared his trading account through Shatkin Trading Company (Shatkin Trading). Equity in the trading account consisted of a combination of amounts in an account used for actual trading and amounts in a cash account. Only the amounts in the actual trading account reflected income for a particular year for tax purposes. If equity in the trading account fell below zero, creating a debit balance, withdrawals from the account would, in effect, constitute a loan for funds from which to trade and for which William was charged interest.

Lonnee derives the $91,137 figure from the fact that William received a tax refund of $109,384 in 1985, $95,000 of which he placed in his trading account. Lonnee argues only $18,247 of the refund constituted nonmarital funds because only $18,247 was carried over from 1983, prior to the parties' marriage, and applied to 1984 taxes. The balance, Lonnee reasons, was marital property subject to division and, · because William failed to explain how he expended those funds, the trial judge should have deemed that expenditure a dissipation.

The $325,000 amount consisted of the initial $250,000 loan noted above, $25,000 of which was repaid in 1985, and two subsequent

Harris Bank loans, totaling $100,000. Lonnee asserts the loans were not obtained for any real need, but to create the appearance William's financial condition had suffered. Lonnee also contends pledging the interest in the Lake Shore condominium as security for the loans violated a preliminary injunction entered against William on February 5, 1986.

First, the record does not support Lonnee's assertion that William's borrowing of funds was in violation of any preliminary injunction. The record indicates that on February 5, 1986, Lonnee filed an "EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION." An order was entered the same day upon agreement of the parties, restraining William from transferring or disposing all marital and nonmarital assets. The order was labeled "RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION." Although, as the order appears in the record, the words "RESTRAINING ORDER AND/OR" contained in its label have been crossed out with a pen, by its terms the order was to expire in 10 days where not extended by subsequent order. A second order was also entered the same day making the "preliminary injunction" "reciprocal" as to both parties. On February 21, 1986, another order was entered stating that the tax refund check was "enjoined from being dissipated by a prior preliminary injunction."

Lonnee subsequently petitioned for William to be held in contempt for violation of the "preliminary injunction." However, she withdrew the petition and sought, thereafter, to have the initial order conformed into one for a preliminary injunction. However, it does not appear from the record that further action was taken to obtain issuance of any preliminary injunction, nor does it appear that the February 5, 1986, order was extended according to its terms. We therefore do not conclude William violated the terms of any preliminary injunction.

William and his accountant, Earl Holtzman, both testified as to William's financial condition. Holtzman stated William had no income from trading in 1985 and his losses from trading totaled $22,105. Holtzman explained that, in preparing William's tax returns, Holtzman based a subsequent year's tax estimate on the tax paid in the previous year. Holtzman testified that a refund of $95,339 was issued for taxes paid in 1984 based on excess taxes paid in 1983. Holtzman stated William's adjusted gross income for 1985 was a negative $95,104 or, if William's alimony payments were included, negative $56,000. William received a refund in 1985 totaling $95,905 based on the excess estimated tax payments William made in 1985 and a

$43,660 credit applied from his 1984 tax refund.

William testified that he earned approximately $1.1 million in gross income in 1984, approximately $925,000 of which was earned that year prior to marrying Lonnee. As a result of the trading losses he suffered beginning in 1985, William stated, he withdrew from monies he had built up in equity in his trading account from previous years and deposited them in personal checking accounts. William testified he began running a debit balance in his trading account in 1985 because he was spending significant amounts of money. He obtained a $250,000 loan from the Harris Bank to pay income taxes due for 1984 and to replenish equity in his trading account. Later in 1985, he paid $25,000 on the bank loan.

Pursuant to a stipulation between the parties, William was permitted to testify in summary form regarding major expenditures. The record indicates the expenditures included the following approximate amounts: $33,000 on the parties' wedding reception; $30,000 in attorney fees in connection with an attempt to modify Lonnee's prior divorce decree; $93,000 in credit card purchases, the majority of which, William testified, were made by Lonnee; $75,000 on furniture and furnishings for the Lake Shore condominium in addition to $101,000 on improvements to that apartment; $3,472.26 per month in alimony and child support from his previous marriage; $94,000 in payments on the two real estate limited partnership investments; $40,000 per year in business expenses; and income taxes totaling $200,000 in 1984 and $160,000 in 1985.

■ In reviewing the record, we do not believe the trial judge abused her discretion in the distribution of property with respect to Lonnee's argument that William dissipated marital assets. Although William did voluntarily incur debit balances in his trading account by withdrawing monies and transferring those funds into personal bank accounts, the record does not indicate William used the transferred funds for his own use to the exclusion of Lonnee. Instead, the record indicates William used the funds to permit him and Lonnee to maintain the life-style he had previously provided, and to which the parties were accustomed, during a period in which William earned negative or decreasing income from trading. We also note that the record indicates William's equity in his trading account, prior to the parties' marriage, was approximately $300,000. We have difficulty understanding how funds in that amount could be included in such a claim for dissipation given that those funds would be considered a nonmarital asset. Further, because William's tax refund can be traced, in large part, to William's income in 1984, the bulk of which was earned prior

the parties' marriage, we cannot conclude a dissipation of that asset occurred upon which to base a claim for dissipation.

Lonnee's third major contention is that the assignment of nonmarital property and division of marital property and indebtedness were against the manifest weight of the evidence. Lonnee argues that the trial judge failed to properly apply the factors contained in section 503(d) of the Act in the assignment of nonmarital property and division of marital property and indebtedness. Lonnee relies, principally, on the same arguments considered above.

On appeal, a property division may only be disturbed upon a showing of an abuse of discretion (*In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 511 N.E.2d 676), and the concern must be whether the distribution is equitable in nature (*In re Marriage of Simmons* (1981), 101 Ill. App. 3d 645, 428 N.E.2d 1032).

We conclude the record does not indicate an abuse of discretion in the trial judge's distribution of property and assignment of indebtedness. As noted above, the record indicates William was the sole source of the funds for all of the assets in the parties' marital estate, as well as their nonmarital estate, with the exception of some personal belongings of Lonnee's, valued at less than $5,000. We note, as did the trial judge, that the parties' marriage was one of brief duration and further note that there is no indication Lonnee sacrificed any development of her career for the benefit of William's.

Last, Lonnee argues the trial judge's decision to deny Lonnee maintenance was against the manifest weight of the evidence. Lonnee contends she was entitled to maintenance based on considerations of her vocational skills, employability, financial circumstances, the standard of living established during the marriage, and William's ability to contribute towards Lonnee's support. Lonnee asserts the trial judge actually punished Lonnee in denying maintenance based on her observation that Lonnee did not attempt to secure employment during the marriage.

First, contrary to Lonnee's assertion, the General Assembly, in one of the most important changes brought about by the Act, created an affirmative duty, under section 504, upon the party seeking maintenance to pursue employment. Ill. Ann. Stat., ch. 40, par. 504, Historical and Practice Notes, at 528 (Smith-Hurd 1980).

We cannot conclude the denial of maintenance in the instant case constituted an abuse of discretion. (See *In re Marriage of Lasota* (1984), 125 Ill. App. 3d 37, 465 N.E.2d 649.) Lonnee was 37 years old at the time of trial, and the record indicates she enjoyed good health. Lonnee was a high school graduate and had attended two years of

classes at two accredited colleges in Florida in addition to taking other classes at an unaccredited institution. She studied psychology and art. The record also indicated that Lonnee had, in the past, worked as a hostess in a restaurant and had sold shoes.

Given the facts of Lonnee's employability and the property distribution to her, including the Florida condominium, we do not conclude the denial of maintenance was an abuse of discretion.

Affirmed.

COCCIA, P.J., and MURRAY, J., concur.