*In re* MARRIAGE OF KAREN W. LEISNER, Petitioner-Appellee, and ANTHONY B. LEISNER, Respondent-Appellant.

First District (2nd Division)   No. 1—89—2637

Opinion filed September 17, 1991.

Leslie L. Veon, of Rinella & Rinella, Ltd., of Chicago, for appellant.

Kalcheim, Schatz & Berger, of Chicago (Michael J. Berger and Andrew D. Eichner, of counsel), for appellee.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Respondent, Anthony Leisner, appeals from the circuit court's distribution of assets between him and petitioner, Karen Leisner, when it granted Karen's petition to dissolve their marriage. He contends that the court erroneously found the following assets to be marital property: (1) monies he received pursuant to a "phantom stock agreement" with his employer; (2) the net proceeds from the sale of his and Karen's former residence; and (3) $141,000 in contributions he made to his employer's profit-sharing plan. In addition, Anthony contends that the court, in finding that he had dissipated assets, improperly failed to specify what assets were dissipated, that it wrongly failed to consider the tax consequences to him of its classification as marital property the proceeds from the phantom stock agreement, and that it awarded Karen an inequitable share of the marital estate. He seeks reversal of the judgment and a remand for a redistribution of assets.

Karen testified during a hearing on a motion *in limine* prior to trial that she and Anthony were married on January 5, 1985, and had one child, the custody of whom they agreed would lie with Karen. At the time of trial, on July 24, 1989, Karen was age 41 and Anthony was 46.

We first discuss the "phantom stock agreement," the proceeds of which the trial court held were marital assets. Anthony's employer, Quality Books, Inc., finding it "desirable to encourage and reward [Anthony] Leisner in a manner that will stimulate his active interest in the development and financial success of the Company and strengthen his desire to remain with the Company," agreed on November 30, 1984 (November 30, 1984, agreement), that if Quality Books was not sold by February 29, 1988 (delivery date), Anthony was to receive a promissory note from it for an amount equal to the value of 20 shares of its common stock (hence the term "phantom stock agreement"), plus "a sum *** equal to the amount of

cash which he would have received on account of [any cash dividends upon the common stock of the Company which would have been declared and paid prior to the delivery date] *** had he been the owner of *** [those 20 shares]." If Quality Books was sold "within a six (6) month period following *** the Delivery Date" (by August 29, 1988), Anthony was to receive a percentage of the sales price, from which the amount payable under the promissory note would be subtracted. The percentage was to be reduced if Anthony voluntarily terminated his employment with Quality Books before such a sale took place. Finally, the agreement stated that it could "not be modified or amended except in writing."

Both Anthony and Tom Drewes, the majority shareholder in Quality Books, testified that a letter was executed "as a statement of good faith" on December 18, 1987 (the letter is dated December 17), regarding an "intent" to be "formalize[d] *** later" to extend the delivery date to February 29, 1992 (December 17, 1987, letter). On February 29, 1988, while negotiations were going on for the sale of the company, Quality Books listed on its balance sheet as a "Long-Term Liability: Note payable" the amount of $33,361, which Drewes testified was equal to the accrued value of "10 percent of [Quality Books'] operating earnings subsequent to 1984." Anthony, according to Drewes, "would have that money if there was no sale." A promissory note for that amount, however, was never issued to Anthony.

Drewes also testified that on July 20, 1988, he signed an amendment to the "agreement as of November 30, 1984," which changed the delivery date from "the 29th day of February, 1988" to "the 28th day of February, 1991." The amendment also ensured that the number of shares the value of which was to be reflected in the promissory note was equal to 10% of Quality Books' common stock (July 20, 1988, amendment). Drewes admitted, however, that Robert Levin, his attorney, wrote to Gregory Brown, Anthony's attorney, in an August 3, 1988, letter concerning "the proposed Amendment to the 1984 Agreement," which he "believe[d] was signed by Tom and Roberta Drewes [the sole shareholders of Quality Books], both individually and on behalf of the company, but not by Tony." The letter further stated:

"On *** August 1, 1988, I received a call from Tony Leisner indicating that, due to circumstances beyond all of our control, he had no intention of signing any of these amendments and intended to live solely by the original Agreement dated November 30, 1984. *** I wish to eliminate all chances of

misunderstanding in the future and advise you formally that, since none of these proposed amendments have been fully agreed to by all of the parties, we deem all of these purported amendments to be null and void and of no force and effect. The original agreement, however, continues to be operative pursuant to its terms."

Another document, dated August 29, 1988 (August 29, 1988, document), but which Brown testified "was executed on or after September 9, 1988" modified the "agreement as of November 30, 1984," by: (1) changing the delivery date from " 'the 29th day of February, 1988' " to " 'the 28th day of February, 1991' "; (2) cancelling "the note from the Company payable to Leisner in the amount of $33,361 as of February 29, 1988[,] *** as a result of this change"; (3) adding a sentence stating that the number of shares the value of which was to be reflected in the promissory note was to be equal to "ten percent (10%) of the equity value of the Company"; and (4) changing the date by which Quality Books was to be sold in order for Anthony to share in the sales price to August 31, 1991. Quality Books was sold on September 13, 1988; Anthony testified that he received $383,900 in 1988 and "[a]pproximately $59,000" in 1989 as a result of the "phantom stock agreement." Pursuant to the August 29, 1988, document, Anthony was to receive additional monies based upon Quality Books' profits during fiscal years 1989, 1990 and 1991.

On November 17, 1988, Brown wrote to Leisner, summarizing the "continuity of documentation evidencing your 'phantom stock' agreement with Quality Books, Inc." The letter stated that the December 17, 1987, letter extended the original delivery date to February 29, 1992, that "a more formal amendment to the 1984 agreement was executed on July 20, 1988," which extended the delivery date to February 28, 1991, and that the August 29, 1988, document made "several other technical changes *** in the agreement." Brown testified at trial, however, that he did not see the December 17, 1987, letter until November 3, 1988, and that he did not see Anthony sign the July 20, 1988, amendment.

Drewes testified that he and Anthony shared a similar office for 21 years, but that they had "[v]ery infrequently" discussed issues concerning his two divorces prior to his marriage to Karen, as well as his marriage to Karen. Anthony, however, testified that he and Drewes "have both chosen not to" take a car allowance from Quality Books of $500 a month to which Anthony was entitled; Anthony stated that he hoped, by refusing the allowance, which would have

been classified as marital property, to increase the profitability of the company. Anthony then answered "Correct" to the question: "In other words, you have decided, knowingly and intentionally, to reduce your income which would be marital with the hope that a Court would find this agreement to be non-marital so you could receive it solely by yourself?" In addition, he testified that he and Drewes had discussed this deferral of the car allowance and that Drewes was "aware of your reasons why you intended to defer your car allowance."

The trial judge found the testimony of Drewes and Anthony concerning the December 17, 1987, letter and July 20, 1988, amendment to lack credibility; accordingly, he found

> "that the December 17, 1987 letter *** was not prepared on December 17, 1987 and that the *** July 20, 1988 [amendment] was and is, in fact, a nullity and that the agreement dated as of August 29, 1988 was not executed until some time in September, 1988, subsequent to the expiration of ANTHONY'S rights under the agreement dated as of November 30, 1984 and, therefore, the monies he has received and will receive as a result of the agreement dated as of August 29, 1988 are marital property."

Anthony first contends that the trial court erred in finding that neither the December 17, 1987, letter nor the July 20, 1988, amendment effectively extended the date by which Quality Books must have been sold in order for Anthony to share in the proceeds of its sale. He argues that the court was mistaken in finding that his and Drewes' testimony lacked credibility, and that, therefore, the two documents should have been found to have extended the date by which Quality Books was to have been sold. Accordingly, he reasons, his premaritally created right to share in the proceeds of the company's sale was preserved, did not "expir[e]" on August 29, 1988, and therefore was not created during the marriage pursuant to the August 29, 1988, document. Karen responds that the trial court's findings were not against the manifest weight of the evidence.

"In nonjury cases, witness credibility is to be determined by the trial court. [Citation.] A reviewing court will not substitute its judgment as to credibility unless against the manifest weight of the evidence." (*Givens v. Givens* (1989), 192 Ill. App. 3d 97, 102; see also *In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 100.) In the instant case, there was sufficient evidence to support the trial judge's determination. Whether Anthony's premarital right to a

share of the proceeds from Quality Books' sale expired on August 29, 1988, depended upon whether prior to that date the deadline was extended. Although both Anthony and Drewes testified that they had executed the December 17, 1987, letter and the July 20, 1988, amendment prior to August 29, 1988, there was some evidence to cast doubt on their testimony.

The court specifically found that

> "the testimony of Tom Drewes, who testified on behalf of ANTHONY, was impeached and contradicted by ANTHONY with regard to whether the two of them had conversations concerning ANTHONY'S desire to avoid having certain monies considered as part of the marital estate. Tom Drewes said they did not; ANTHONY said they did."

Anthony argues that Drewes' testimony was not impeached. Although the court found that Drewes had testified that "they did not" converse about "ANTHONY'S desire to avoid having certain monies considered as part of the marital estate," the record discloses that Drewes answered, "Very infrequently" when questioned at trial about whether such conversations had ever occurred. Nevertheless, even if "impeached" is not the proper term to describe the effect of Anthony's testimony on Drewes', Anthony's decision, with Drewes' knowledge, to forego his car allowance in order to reduce the value of the marital estate, in the hope that the proceeds of the phantom stock agreement would be classed as nonmarital, gave the court reason to believe that Anthony and Drewes could have discussed this concern of Anthony's more than "[v]ery infrequently."

In addition, other evidence calls the execution date of the two documents into doubt. The August 29, 1988, document, for example, failed to take their existence into account, amending, as it did, the November 30, 1984, agreement as if no subsequent documents had affected that agreement. In fact, the August 29, 1988, document cancelled the "note from the Company payable to Leisner in the amount of $33,361 as of February 29, 1988, *** as a result of this change [in the delivery date]"—a note which would not have existed if the delivery date had been previously changed. In addition, Robert Levin's letter of August 3, 1988, stating that no proposed amendments had been fully executed and that the November 30, 1984, agreement was still fully in place, as well as Gregory Brown's testimony that despite writing a November 17, 1988, letter which stated that the December 17, 1987, letter and July 20, 1988, amendment had been effective, he never saw the former until No-

vember 3, 1988, and never saw the latter executed by Anthony also supports the trial judge's finding.

Next, Anthony avers that even if neither the December 17, 1987, letter nor the July 20, 1988, amendment effectively extended the date by which Quality Books must have been sold in order for him to share in its sale proceeds, the trial court erred in finding that his right to share in the proceeds expired on August 29, 1988, only to be recreated "some time in September, 1988[,]" by the August 29, 1988, document. He avers that he and Quality Books waived the November 30, 1984, agreement's requirement that the date could be changed only in writing and that they agreed prior to August 29, 1988, to extend that date. Accordingly, he asserts, the August 29, 1988, document was not a new agreement, but was merely a modification of the premarital November 30, 1984, agreement; therefore, his right to sale proceeds was not created during the marriage. As with the previous issue, Karen responds that the trial court's finding was not against the manifest weight of the evidence.

■ Here also, the evidence supports the circuit court's finding. If Anthony's argument is correct, Quality Books would have been required to abide by the terms of the November 30, 1984, agreement if it had been sold between August 29, 1988, and the date on which the August 29, 1988, document was fully executed. But the evidence he cites does not compel such a conclusion. Rather, the record shows only that the parties were negotiating changes to the November 30, 1984, agreement, changes which they were taking pains to put into writing. This does not compel the conclusion that they had orally agreed to changes in the delivery date. In fact, the dating of the August 29, 1988, document on the very date the November 30, 1984, agreement was to expire, in light of our discussion above concerning efforts by Anthony and Drewes to maintain proceeds as nonmarital property, supports the conclusion that the parties had not orally agreed to change the delivery date; if they had, there would have been no reason not to put the actual date of execution on the document. Accordingly, we hold the court's finding that the proceeds of the phantom stock agreement were marital property to be supported by the evidence.

We next turn to the issue of the trial court's disposition of the proceeds from the sale of the Leisners' former residence. Anthony testified that he met Karen "after Valentine's Day of [19]83." In April 1983, he purchased a house at 898 Elm Street, in Winnetka (Elm Street residence), and moved into the house with his son Bill

and with Karen in May or June 1983. He told the court that he purchased the house so that Bill, who was "severely dyslexic," could be enrolled "into a better school system." Karen did not contribute to the down payment on the house; she did, however, contribute $750 a month "towards the payment of household expenses"; Anthony paid the balance of such expenses, which were equal to about $2,000 a month. He also paid for improvements to the house with his separate property, a bank account at the First National Bank of Lake Forest. On May 22, 1984, Anthony executed a holographic "Final Will" which stated in pertinent part:

> "If I am still living with Karen Weeder at the time of my demise then Karen is to have my interest in the house [at 898 Elm] in recognition of her participation and financial contribution to its upkeep. Otherwise it too is to be divided between my children."

Anthony testified that although Karen helped paint and decorate the Elm Street residence, he performed "[t]he bulk of the painting and remodeling." He did about "90 percent of the labor" required to "finish[] the entire lower level ***[,] add[] three rooms, *** re[do] the bathroom upstairs, *** insulate[] the entire house ***[,] repair[] some holes in the exterior wall *** and *** put in a pantry." The Leisners moved from the Elm Street residence in November 1985; it was initially rented, and then sold in July 1987.

Karen testified that she met Anthony in January 1983 and that they then began dating each other exclusively. In early April 1983, Anthony told her

> "that he had been looking for a house for himself and his son Bill but that the houses that he had been looking at were too small for all of us, and that he realized that we had been only dating a short time, but you know, would I live him [sic]. If I wanted to live with him, then he would look for a house that was large enough for all of us."

Karen replied that she "was ready to make a commitment." She and Anthony found the house later in the month. When discussing whether to buy the house, Karen told Anthony that she liked the house because "the raw, unfinished space downstairs made it possible for us to expand as a family." Finally, in May 1983, before they moved into the house, Karen told Anthony

> "that I thought we ought to have a time table because there we were moving in together, and it was a financial commitment to do that. And he said that it wasn't really a question of commitment, but it was going to be—He had just been

through two divorces, and it had been very hard on his son, and he felt that his son needed time to get used to a new stepmother, and so I agreed."

Karen testified that if Anthony had said "no, he would not get married, I would not have moved in." She and Anthony discussed marriage subsequent to their moving into the house; she "thought that certainly sometime that fall, that we would become engaged or we would have some kind of more formal plans or some time table as to when we would get married, but that was a very chaotic year." She further stated that Anthony "did not" ever tell her that he was not going to marry her. They "became engaged in late August or early September of 1984."

Anthony contends that the trial court's finding that the house was purchased in contemplation of marriage, thus causing it to be classified as marital property, was against the manifest weight of the evidence. He points to his reasons for buying the house, the short time he and Karen knew each other before its purchase, the use of his money for the down payment and improvements, the paucity of any evidence that, prior to buying the house, he promised to marry her, his holographic will's implication that he contemplated only living with Karen and the substantial amount of time between the date they moved into the house and that of their engagement. Karen responds that the trial court's determination was supported by the evidence, noting that Anthony borrowed the funds for the down payment from his profit-sharing plan with Quality Books (discussed below), and that when in 1987 he declared this amount as income rather than as a loan, she helped pay taxes on it. Further, she notes her contributions to the upkeep of the house and the conversations between her and Anthony, prior to moving in, concerning an eventual marriage. Finally, she maintains that the holographic will cited by Anthony actually helps prove her case that she and Anthony contemplated marriage when the house was purchased.

■■ "For purposes of this [Illinois Marriage and Dissolution of Marriage] Act, 'marital property' means all property acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property': *** (6) property acquired before the marriage ***." (Section 503(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1987, ch. 40, par. 503(a)).) The residence here in question was acquired before the marriage; however, a home purchased prior to but in contemplation of marriage is treated as a marital asset. *In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 177-79; *In re Marriage of Ohrt* (1987),

154 Ill. App. 3d 738, 742; *In re Marriage of Reeser* (1981), 97 Ill. App. 3d 838, 840; *In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 99.

A review of cases in which a home acquired prior to marriage was nevertheless found to have been purchased in contemplation of marriage leads us to conclude that the trial court's disposition of the Elm Street residence was against the manifest weight of the evidence. In *Malters*, the couple married in March of the same year in which they purchased the home in question (*Malters*, 133 Ill. App. 3d at 170-73); they were living together at the time of the purchase and had discussed acquiring a marital home; they both accompanied the real estate agent to view the property for the first time; they both signed the offer to purchase the property, which was purchased in the husband's name; and funds from both parties contributed both to the down payment and to payments on the mortgage. 133 Ill. App. 3d at 177-78.

In *Ohrt*, the husband purchased the home in his name two months before the marriage, and only marital funds were used to finance the down payment and the mortgage on the residence; moreover, the husband, who had appealed the finding that the home was marital, had admitted at trial that it was purchased with the idea that it would be the marital residence. (*Ohrt*, 154 Ill. App. 3d at 741-42.) In *Stallings*, the home in question was purchased less than two months before the marriage and title to it was taken by both parties as tenants in common. Further, all equity in the property, with the exception of the down payment, resulted from the use of marital funds. *Stallings*, 75 Ill. App. 3d at 99.

In the instant case, we fail to see how the evidence could have shown that the Elm Street residence was purchased in contemplation of marriage. Even if the trial judge did not accord any credibility to Anthony's testimony, given his findings relating to the phantom stock agreement, the remaining facts adduced at trial lead us to the conclusion that Karen "failed to sustain her burden of establishing that this property was purchased in contemplation of the parties' future marriage." (*In re Marriage of Reeser* (1981), 97 Ill. App. 3d 838, 840.) More than 15 months elapsed between the purchase of the residence and the Leisners' engagement; another four months elapsed until the marriage. Moreover, Anthony's statement testified to by Karen that he wanted some time to pass before they set a timetable for marriage hardly shows that the house was purchased "in contemplation" of marriage, but rather, only that marriage was a possibility, as it would in almost any situation where

two unmarried persons agreed to reside together. At most, the evidence shows that at the time the residence was purchased, Karen planned to eventually marry; it fails to show that Anthony had similar plans. The holographic will upon which Karen relies implies only that Anthony contemplated living with Karen for some additional time, not that marriage was contemplated. Finally, unlike the facts in *Ohrt* and *Malters*, in which the down payment was made with funds belonging to both parties or by loans for which both parties were responsible, the down payment in the case at bar was paid for with a loan taken from Anthony's profit-sharing plan with his employer (discussed below). Although Karen and he jointly paid taxes on that loan when they decided in 1987 to treat it as income rather than to repay it, its treatment as joint income at that late date is not probative of the intent of the parties to marry at the time the residence was purchased.

Finally, although some mortgage payments were made with marital funds, "nonmarital property is not transmuted into marital property merely as the result of the use of marital funds to reduce the indebtedness on the property." (*Reeser*, 97 Ill. App. 3d at 840.) To the extent that Karen should be reimbursed, as she averred at oral argument, for contributions made to reduce the mortgage and to improve the residence, such issues we leave to be determined on remand. (See *In re Marriage of Drennan* (1981), 93 Ill. App. 3d 903, 907-08.) Accordingly, we reverse the trial court's finding that the Elm Street residence was marital property.

Next, we discuss the disputed proceeds from Anthony's profit-sharing plan with Quality Books. Quality Books had a retirement plan in which Anthony participated. On March 1, 1984, he had a vested interest of $67,721 in a profit-sharing plan and a vested interest of $32,309 in a pension plan, the proceeds of which were merged during the ensuing year into the profit-sharing plan. On February 28, 1985, he had a vested interest of $118,664 in the now-consolidated profit-sharing plan; $10,464 of the increase during the preceding year was due to Quality Books' contributions, and $8,170 was due to the year's earnings on the prior balance. On February 28, 1986, Anthony had a vested interest of $166,137 in the plan; $8,222 had been contributed by Quality Books during the preceding year and $39,351 had been earned on the prior balance. On February 28, 1987, Anthony had a vested interest of $210,281 in the plan; $15,826 had been contributed by Quality Books during the preceding year and $28,318 had been earned on the prior balance. On February 29, 1988, Anthony had a vested interest of $208,281

in the plan; $14,417 had been contributed by Quality Books during the preceding year, $10,509 had been earned on the prior balance and $26,400 had been distributed to Anthony. On February 28, 1989, Anthony had a vested interest of $231,090 in the plan; $5,915 had been contributed by Quality Books during the preceding year and $16,368 had been earned on the prior balance. The trial court found that $141,000 of the amount in this plan was a marital asset, as "representing contributions [Anthony] made to the plan during his marriage." Anthony contends that this finding was against the manifest weight of the evidence, as the trial court had sufficient data from which it should have apportioned the amount earned on the plan during his marriage between that earned on contributions made before the marriage and that earned on contributions made subsequent to the marriage. Karen responds that Anthony failed to present clear and convincing evidence of what portions of the profit-sharing plan should be maintained as nonmarital property, and that, therefore, the court did not err in including as marital property interest earned on nonmarital contributions.

■■ ■ Pursuant to section 503(a)(6) of the Act, the pension and the profit-sharing plan at the time of Anthony's marriage were his nonmarital properties; nor did the merger of the pension plan into the profit-sharing plan during fiscal year 1985 change either plan's status. (See *In re Marriage of DiAngelo* (1987), 159 Ill. App. 3d 293, 296.) The increase during the marriage in the value of the now-consolidated profit-sharing plan, regardless of its source, was also Anthony's nonmarital property, subject, according to section 503(a)(7) of the Act, "to the right of reimbursement." (See *DiAngelo*, 159 Ill. App. 3d at 296.) That right of reimbursement provides:

> "Commingled marital and non-marital property shall be treated in the following manner ***: *** (2) When one estate of property makes a contribution to another estate of property ***, the contributing estate shall be reimbursed from the estate receiving the contribution ***; provided, that no such reimbursement shall be made with respect to a contribution which is not retraceable by clear and convincing evidence ***." Ill. Rev. Stat. 1987, ch. 40, par. 503(c)(2).

*DiAngelo*, 159 Ill. App. 3d at 296-97.

■ In *DiAngelo*, the trial court found all of a profit-sharing account which existed before the marriage to be nonmarital property, but its finding was reversed on the ground that some of the increase in the value of that account during the marriage was the

result of the contribution of marital assets. (159 Ill. App. 3d at 297.) In the instant case, the trial court not only properly reimbursed the marital estate for the contributions it made to the profit-sharing plan and for the earnings on those contributions, but also gave the marital estate the increase in the value of the plan which resulted from earnings on what Anthony had contributed prior to marriage, which was not "subject to the right of reimbursement." (Ill. Rev. Stat. 1987, ch. 40, par. 503(a)(7).) The evidence at trial allowed the trial court to apportion the annual earnings between those monies contributed prior to and subsequent to the marriage; accordingly, its finding that all increase in the value of the plan subsequent to the marriage was marital property was decidedly contrary to the evidence.

Next, Anthony claims that the trial court's finding that $402,900 received pursuant to the phantom stock agreement was a marital asset was clearly erroneous because the court failed to consider Anthony's testimony that he had paid approximately $106,500 in taxes on that amount and that he still owed approximately $20,000 in taxes on what he had received. Additionally, he avers that the trial court abused its discretion when, in finding that he "ha[d] dissipated assets," it failed to specifically find what assets were dissipated and what value they had. Finally, he alleges that the distribution of the marital estate was inequitable because the trial court failed to consider the short length of the marriage and the contribution of each party to the acquisition of the marital property.

Section 503(d) of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 503(d)) states that the court

> "shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:
>
> (1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property ***; *** (3) the duration of the marriage; *** and (11) the tax consequences of the property division upon the respective economic circumstances of the parties."

■■ ■ We first note that Anthony cites no authority for his proposition that a trial court, when *valuing* an asset, is required to deduct from that value the amount of taxes which were paid on it; rather, it is required by section 503(d) to consider "the tax consequences of the property *division*" (emphasis added). Second, be-

cause we have reversed some of the findings of the trial court with regard to its classification of assets, we do not believe that any purpose would be served by reviewing the propriety of the court's overall division of property or whether the record supports the extent to which Anthony's alleged dissipation of assets may have affected that division. As in *In re Marriage of Thacker* (1989), 185 Ill. App. 3d 465, 470, in which the appellant "raise[d] arguments pertaining to the trial court's apportionment of marital debt and to the order requiring him to pay a portion of [his spouse's] attorney fees[,] *** [o]ur reversal as to the property distribution necessarily will require the trial court to reexamine [those issues] in light of the adjusted financial resources of the parties."

For the foregoing reasons, we affirm in part and reverse in part the judgment of the circuit court, and remand for further proceedings not inconsistent with the views expressed in this opinion.

Affirmed in part, reversed in part and remanded.

HARTMAN and DiVITO,* JJ., concur.

---

*Although Judge DiVito did not participate in the oral argument had in this case, he has read the briefs, audited the tape made at oral argument, and has otherwise participated in the decision-making process.