# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Weisman*, 2011 IL App (1st) 101856

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF LARRY E. WEISMAN, Petitioner-Appellee, and LAUREN RAUTBORD WEISMAN, Respondent-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-10-1856 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Rehearing denied<br>Opinion filed | August 24, 2011<br><br>September 16, 2011<br>September 20, 2011<br>September 28, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's distribution of a residence and an investment to petitioner as his nonmarital property was reversed and the cause was remanded for reclassification and redistribution where the residence was purchased in contemplation of the parties' marriage in part with marital funds, and the investment was purchased with some funds derived from the mortgages on the residence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-D-11809; the Hon. William S. Boyd, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | Joel Ostrow, of Bannockburn, for appellant. |
|---|---|
| | Karen L. Levine and Melissa B. Pryor, both of Miller, Shakman & Beem LLP, and Bradley D. Birge, both of Chicago, for appellee. |
| Panel | JUSTICE MURPHY delivered the judgment of the court, with opinion. Justices Neville and Steele concurred in the judgment and opinion. |

**OPINION**

¶ 1 Respondent, Lauren Weisman, appeals from a judgment for dissolution of marriage entered by the circuit court of Cook County dissolving the marriage between her and petitioner, Larry Weisman, and awarding the parties' Chicago residence and investments in a partnership to petitioner as his nonmarital property. On appeal, respondent contends that the court erred by allocating the residence and investments to petitioner as nonmarital property. For the reasons that follow, we reverse and remand.

¶ 2 BACKGROUND

¶ 3 On November 13, 2006, petitioner filed a petition for dissolution of marriage in which he asserted that he and respondent lived at 1921 North Cleveland Avenue in Chicago and did not have any children together. Petitioner further asserted that irreconcilable differences had caused a breakdown of their marriage and that any attempts at reconciliation would be impracticable and not in their best interests.

¶ 4 At trial, respondent testified that she and petitioner became engaged on January 1, 1997, and were married on June 21, 1997. When they first met, respondent was living in a townhouse in the Lincoln Park neighborhood in Chicago with her two children from a prior marriage, and petitioner was living in Highland Park, a suburb of Chicago. Petitioner also had two children from a prior marriage, and although he had custody, they lived with their mother. At the time respondent and petitioner became engaged, respondent was working as an interior designer for Paul Lauren Designs, a business she had formed with her uncle, Paul Marchetti.

¶ 5 Petitioner and respondent discussed the prospect of petitioner moving from Highland Park to Chicago shortly after they became engaged, and petitioner instructed respondent to look for a house for them. Respondent explained that their goal was to find a house in which all their children could live. Respondent began looking on January 5, 1997, and found a house she liked at 1921 North Cleveland Avenue on January 10, 1997. The house was still under construction when respondent first saw it, and the asking price was $1.7 million.

Respondent called her friend Greg Viti, a realtor, and told him that she and petitioner were buying a house and that she had found one she liked. Respondent and Viti looked at about 25 houses over the next two weeks, and respondent would talk about the houses that she had seen with petitioner in the evenings and showed him the Cleveland house.

¶ 6    Respondent made numerous changes to the design of the house and began developing her designs the day she saw it. Petitioner did not purchase the house until he knew what design changes respondent was going to make to it, and respondent worked on those changes and their implementation on a daily basis until early 1998. Respondent worked with the architect and redesigned almost every room in the house to accommodate their family and provide bedrooms and washrooms for each of their four children. Petitioner did not object to any of respondent's design changes, and as respondent worked on the house, she believed it was "our house" and she was never told otherwise. Respondent, however, was not involved in negotiating the price of the house with Jay Metzler, the builder/developer, and was not present for the closing.

¶ 7    After respondent and petitioner became engaged, petitioner began paying the rent for respondent's Lincoln Park townhouse. In April or May 1997, the lease ran out on the townhouse and respondent moved in with petitioner in his Highland Park house while the Cleveland house was being constructed. Respondent moved into the Cleveland house in October 1997, and her children lived there as well until they went to college. Petitioner moved into the Cleveland house full-time sometime in 1998.

¶ 8    In July 1998, respondent received a phone call from petitioner's ex-wife Wendy, who told her that petitioner was "a schemer" and had been bragging to her lawyer about how respondent's name was not on the title to the Cleveland house. Respondent called petitioner and told him about the conversation, and he responded that his ex-wife was jealous of her and that "you own our house. We own it together."

¶ 9    In 2004, the issue of whether respondent was on the title of the Cleveland house arose during marriage counseling. Petitioner told respondent that she was on the title of the house, and respondent went to the recorder of deeds and learned that she was not. Petitioner then told her that he would take care of it and that he had put the house in a land trust, but respondent did not know for sure whether he had actually done so.

¶ 10    Petitioner testified that he was living with his children in his house in Highland Park when he began dating respondent in January 1996. By that time, petitioner had decided that he was going to move to Chicago once his responsibilities to his children had been satisfied. His engagement to respondent, however, accelerated that move, and he began looking for a house in January 1997 with petitioner and Viti. Petitioner had a number of conversations with respondent regarding the purchase of the Cleveland house in January and/or February 1997, during which he informed respondent that he would enter into the contracts to purchase the land and the house and take title, and respondent said that was "fine."

¶ 11    Petitioner was involved in negotiations with Metzler from January through March 1997, and respondent was present for some of those meetings. Petitioner entered into a contract to purchase the land on which the house was to be built on February 10, 1997, and entered into a contract to purchase the house itself on March 18, 1997. The property was titled in

petitioner's name, and he explained that he had decided to purchase the Cleveland house prior to his marriage to respondent so that it would constitute nonmarital property.

¶ 12    Petitioner further testified that the closing occurred on March 15, 1997, and that he made a payment of about $415,000 with funds from his Mesirow brokerage account to purchase the land on which the house was to be built. Petitioner was also to make three payments during construction, the first two of which were for $428,333 and which were made on April 3 and May 30, 2007, with funds from his Mesirow account. The third payment was to be for $428,333, plus whatever extras had been built in by that time.

¶ 13    In March 1997, the in-house architect changed the plans for parts of the house based on requests made by petitioner and respondent. From June through October 1997 respondent and her children lived in petitioner's house in Highland Park. During that period of time, petitioner and respondent monitored the progress of the construction of the Cleveland house, and they moved into that house on October 7, 1997.

¶ 14    Petitioner recalled that he had a discussion with respondent regarding the title of the Cleveland house in 2002 in the presence of a marriage therapist, in which respondent informed him that she had been to the recorder of deeds and had learned that the title to the property was in his name only. Respondent asserted that they should jointly hold title to the property, and petitioner told her that he would think about it, but did not subsequently change the title.

¶ 15    Petitioner further testified that he had obtained numerous interest-only mortgages on the Cleveland house, the first of which was obtained on June 19, 1997, two days before his marriage to respondent, from Mid-City National Bank (Mid-City) in the amount of $1.3 million. Petitioner explained that he did so because he "wanted to take the purchase as far as [he] could before the marriage" and "wanted to do everything [he] possibly could to keep that asset for [him] and titled in [his] name." Petitioner placed $1 million from that mortgage into his Mesirow account and loaned the other $300,000 to a company called Astarte Fibre Networks. On October 7, 1997, petitioner obtained a $1 million mortgage from Great West Mortgage Company (Great West) and used about $530,000 of those funds to make the final payment on the Cleveland house, while using the remainder of the funds to pay down the Mid-City mortgage and to pay off a margin debt on his Mesirow account. On December 31, 1997, petitioner obtained a rewrite of the Mid-City mortgage for $809,025.87, of which he used $109,025.87 to pay off the remainder of the June 19, 1997, Mid-City mortgage and deposited the remaining $700,000 into his Mesirow account. On January 5, 1998, petitioner used that $700,000 to acquire an interest in a partnership called Styx, and on March 26, 1998, he invested an additional $400,000 in Styx with funds from his Mesirow account.

¶ 16    Petitioner subsequently obtained a mortgage for about $1.8 million from Merrill Lynch Credit Corp. (Merrill Lynch), in 2003 and used those funds to pay off the outstanding mortgages from Great West and Mid-City. On August 11, 2005, petitioner obtained another mortgage from Merrill Lynch for about $1.8 million and used those funds to pay off the 2003 mortgage. At the time of trial, the 2005 mortgage was the only outstanding mortgage on the Cleveland property, and none of its principal had been paid down.

¶ 17    On cross-examination, petitioner stated that he had intended to buy a house in Chicago

following his engagement to respondent in which they could live with respondent's children and that neither he nor respondent attended the closing. Petitioner also stated that respondent was angry when she told him she had learned that the Cleveland house was titled under his name only and that it appeared she had assumed her name was on it. Petitioner further stated that he had been making monthly interest payments on the various mortgages with money from his earnings and subsequent mortgages.

¶ 18    Following trial, the circuit court entered a judgment for dissolution of marriage in which it found that the Cleveland house and the Styx investment were petitioner's nonmarital properties. In doing so, the court found that both petitioner and respondent had testified credibly regarding the purchase of the Cleveland house. The court further determined that the house was not purchased in contemplation of marriage where the only funds used in its purchase were from petitioner's nonmarital property, petitioner signed the contracts for the sale of the land and the construction of the house, petitioner held sole title to the property, and the purchase was made three months prior to the marriage. Respondent now appeals from that order.

¶ 19                                        ANALYSIS

¶ 20    Respondent contends that the circuit court erred by determining that the Cleveland house and the Styx investment were petitioner's nonmarital properties. In an action for dissolution of marriage, a circuit court's classification of property as marital or nonmarital will not be reversed by a reviewing court unless its classification is against the manifest weight of the evidence. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 669 (2008). A court's finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

¶ 21                                    I. Cleveland House

¶ 22    Although property acquired before marriage is generally not considered marital property, it may be characterized as such where it was acquired "in contemplation of marriage." 750 ILCS 5/503(a)(6), (a)(7) (West 2006); *In re Marriage of Olbrecht*, 232 Ill. App. 3d 358, 363-64 (1992). Petitioner initially asserts that the "in contemplation of marriage" doctrine may only be applied where common finances were used to purchase the property at issue (*In re Marriage of Philips*, 200 Ill. App. 3d 395, 401 (1990)) and maintains that the doctrine should not be applied in this case because the Cleveland house was purchased entirely with his nonmarital funds.

¶ 23    Petitioner testified that he made three payments totaling $1.272 million toward the purchase of the Cleveland house and property between March 15 and May 30, 1997. On October 7, 1997, following his marriage to respondent, petitioner obtained a $1 million mortgage on the Cleveland house from Great West and used about $530,000 of those funds to make the final payment on the house. Petitioner then obtained a $1.8 million mortgage from Merrill Lynch in 2003 to pay off the Great West and Mid-City mortgages and obtained another $1.8 million mortgage from Merrill Lynch in 2005 to pay off the 2003 mortgage. On

cross-examination, petitioner stated that he made monthly interest payments on those mortgages with funds derived from his earnings and had not yet paid off the 2005 mortgage at the time of trial.

¶ 24 The record thus shows that petitioner paid $1.272 million toward the Cleveland property with his own nonmarital funds prior to marriage. The record also shows, however, that petitioner paid the remaining $530,000 with funds obtained from the Great West mortgage, which was obtained while he was married to respondent, and that he made monthly interest payments on that mortgage and the mortgages from which he obtained the funds to pay off that mortgage with marital funds. As such, we determine that the Cleveland property was not purchased solely with nonmarital funds where petitioner obtained $530,000 of the funds used to purchase the property from a mortgage on which he subsequently made monthly payments with marital funds. Thus, even if petitioner is correct in asserting that the "in contemplation of marriage" doctrine may not be applied where the property at issue has been purchased entirely with one spouse's premarital funds, this is not such a case.

¶ 25 In reaching that determination, we have considered *In re Marriage of Eddy*, 210 Ill. App. 3d 450 (1991), cited by petitioner, and find it distinguishable from this case. In *Eddy*, 210 Ill. App. 3d at 457-58, this court held that the respondent's businesses were formed from nonmarital funds where the loans that provided those funds were made to the respondent and his brother, were secured by property they owned, and were repaid with revenues from those businesses. In this case, however, the monthly payments petitioner made on the mortgages at issue were made with marital funds.

¶ 26 Having determined that the Cleveland house was not purchased entirely with petitioner's nonmarital funds, we now consider whether the property was purchased in contemplation of marriage. In determining whether property was acquired in contemplation of marriage, a court should examine the totality of the circumstances to discover the parties' intent. *Olbrecht*, 232 Ill. App. 3d at 363. In doing so, a court may consider such facts as the source of funds used to acquire the property, the identity of the person that signed the contract, the amount of time between the purchase and the marriage, and the name in which title was held. *In re Marriage of Jacks*, 200 Ill. App. 3d 112, 118 (1990).

¶ 27 For the reasons that follow, we conclude that the circuit court's finding that the Cleveland house was not purchased in contemplation of marriage is against the manifest weight of the evidence. Both parties testified that the Cleveland house was purchased with the idea that it would be a marital residence where they each testified that they had intended to purchase a house in Chicago in which they could live with their children and petitioner testified that although he had planned to move to Chicago once his responsibilities to his children had been satisfied, his engagement to petitioner accelerated that move. *In re Marriage of Ohrt*, 154 Ill. App. 3d 738, 742 (1987). Prior to purchasing the house, both petitioner and respondent had been looking for houses and had gone to see the Cleveland house. *Olbrecht*, 232 Ill. App. 3d at 364; *Jacks*, 200 Ill. App. 3d at 118; *In re Marriage of Malters*, 133 Ill. App. 3d 168, 177 (1985). Respondent made changes to the design of the house to accommodate the parties' four children. *Olbrecht*, 232 Ill. App. 3d at 364; *Jacks*, 200 Ill. App. 3d at 118. In addition, the parties were already engaged when they began looking for a house, the house was purchased only three months prior to their marriage, petitioner was

-6-

paying respondent's rent at the time of the purchase, and respondent moved in with petitioner in his Highland Park house upon the expiration of her lease while the Cleveland house was being constructed. *Cf. In re Marriage of Leisner*, 219 Ill. App. 3d 752, 762-63 (1991) (residence was not marital property where it was purchased more than 15 months prior to the parties' engagement and there was no evidence that the respondent planned to marry the petitioner at the time of purchase); *In re Marriage of Reeser*, 97 Ill. App. 3d 838, 840 (1981) (house was not marital property where there was no evidence as to when the parties became engaged or where the petitioner lived prior to purchasing the house).

¶ 28 Petitioner nonetheless asserts that a number of factors support the conclusion that the house was not purchased in contemplation of marriage. Petitioner first maintains that the house was purchased entirely with his nonmarital funds. However, as stated above, the record shows that $530,000 of the purchase price was paid for with proceeds from the Great West mortgage and that petitioner used marital funds to make the monthly payments on that mortgage and the mortgages from which he obtained the funds to pay off that mortgage. *Ohrt*, 154 Ill. App. 3d at 742; *Malters*, 133 Ill. App. 3d at 177-78.

¶ 29 Petitioner also maintains that the timing of the purchase is strong evidence of his intent that the house not become a marital asset where he testified that he purchased it prior to his marriage to respondent so that it would constitute nonmarital property. However, petitioner's testimony that he purchased the Cleveland house prior to his marriage so that it would not constitute nonmarital property in the event he and respondent later divorced does not show that he did not purchase the house with the intent that it would be the marital residence. In fact, his concern regarding whether the house would be classified as marital property following a divorce further supports the conclusion that it was purchased in contemplation of marriage.

¶ 30 Further, while we agree with petitioner that he signed the contracts to purchase the land and the house itself and that title to the property was solely in his name and note that the record shows that petitioner expended a significant amount of his own nonmarital funds in the purchase of the house, we determine that those facts are outweighed by the substantial evidence showing that petitioner purchased the Cleveland house in contemplation of marriage outlined above. To the extent petitioner's contribution to the acquisition of the house may have been disproportionate to that made by respondent, that is a factor the circuit court may consider in dividing the marital property (750 ILCS 5/503(d)(1) (West 2006)) or determining whether petitioner may be entitled to reimbursement (750 ILCS 5/503(c)(2) (West 2006)). We thus conclude that the circuit court's finding that the Cleveland house is petitioner's nonmarital property because it was not purchased in contemplation of marriage is against the manifest weight of the evidence.

¶ 31                                    II. Styx Investment

¶ 32 Petitioner further asserts that the Styx investments are nonmarital property because they fall within the statutory exception for property acquired after marriage in exchange for property acquired before the marriage. All property acquired by a spouse subsequent to marriage is marital property except for certain types of nonmarital property, such as "property

acquired in exchange for property acquired before the marriage." 750 ILCS 5/503(a)(2) (West 2006). The record shows that petitioner made investments of $700,000 and $400,000 in Styx in 1998 while he was married to respondent. Thus, those interests were acquired after the parties were married and are marital property unless they fall within one of the statutory exceptions.

¶ 33    Petitioner maintains that the interests in Styx were acquired in exchange for nonmarital property because they were purchased using funds derived from the mortgages on the Cleveland house. However, since we have already determined that the Cleveland house is marital property because it was bought in contemplation of marriage, we therefore must also determine that the interests in Styx were not acquired in exchange for nonmarital property. As such, we conclude that the circuit court's classification of the Styx investment as petitioner's nonmarital property is against the manifest weight of the evidence.

¶ 34                                  CONCLUSION

¶ 35    Accordingly, we reverse the portions of the order of the circuit court of Cook County for dissolution of the parties' marriage awarding the Cleveland residence and the Styx investment to petitioner as his nonmarital properties and remand for reclassification and redistribution of the two assets and any further proceedings consistent with this order.

¶ 36    Reversed and remanded.